UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

St. Gertrude's Health Center,
a Minnesota non-profit private corporation,

                        Plaintiff,                    **MEMORANDUM OPINION AND ORDER**

      v.                                         Civil No. 07-3955 ADM/JSM

Michael O. Leavitt,
Secretary of Health and Human Services,

                        Defendant.

_____

Laura S. Weintraub, Esq., Johnson, Killen & Seiler, P.A., Duluth, MN, argued on behalf of Plaintiff.

David W. Fuller, Esq., Assistant United States Attorney, Minneapolis, MN, argued on behalf of Defendant.
_____

## I. INTRODUCTION

On July 23, 2008, the undersigned United States District Judge heard argument on Plaintiff St. Gertrude's Health Center's ("St. Gertrude") Motion for Summary Judgment [Docket No. 9] and Defendant Secretary of Health and Human Services Michael O. Leavitt's ("the Secretary") Motion for Summary Judgment [Docket No. 14]. In its Complaint [Docket No. 1], St. Gertrude seeks judicial review of the Secretary's denial of St. Gertrude's request for a new-provider exemption from the routine cost limits on Medicare reimbursements. For the reasons set forth herein, St. Gertrude's Motion for Summary Judgment is denied and the Secretary's Motion for Summary Judgment is granted.

## II. BACKGROUND[1]

**A.     Regulatory Framework**

Before addressing the facts involved in this litigation, an overview of certain Medicare regulations is warranted.

Under the Medicare Act, 42 U.S.C. §§ 1395–1395iii, a skilled nursing facility ("SNF")[2] is entitled to reimbursement for the reasonable costs of care for particular services provided to Medicare patients. See 42 U.S.C. § 1395f(b)(1); 42 C.F.R. § 413.1(a)(2)(ii), (b), (g). "Reasonable costs" are defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). The Secretary, who acts through the Centers for Medicare and Medicaid Services ("CMS"), is vested with the discretion to elaborate on this definition through regulations and to establish "limits on the . . . costs . . . to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services." Id.; see also Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 405 (1993) ("Rather than attempt to define 'reasonable cost' with precision, Congress empowered the Secretary to issue appropriate regulations setting forth the methods to be used in computing such costs.").

In an effort to encourage Medicare-certified SNFs to operate efficiently, Congress has instructed the Secretary to establish routine cost limits ("RCLs") to serve as a cap on the

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). As both parties have moved for summary judgment, any disputed facts are noted.

[2] Generally speaking, a SNF is a facility that is primarily engaged in providing skilled nursing care and related services or rehabilitation services and not primarily for the care and treatment of mental diseases. 42 U.S.C. § 1395i-3(a).

maximum amount that the federal government will reimburse a SNF under the Medicare program. See St. Elizabeth's Med. Ctr. of Boston, Inc. v. Thompson, 396 F.3d 1228, 1230 (D.C. Cir. 2005) (citing 42 U.S.C. §§ 1395f(b), 1395x(v), 1395yy). The Secretary is authorized, however, to establish appropriate exemptions and exceptions to the RCLs. 42 U.S.C. § 1395yy(c). One such exemption promulgated by the Secretary is the "new provider exemption," which allows new SNFs to receive reimbursements without regard to the RCLs during their first two years of operation. 42 C.F.R. § 413.30(e).[3]

**B.      Factual and Procedural Background**

St. Gertrude is a fifty-one bed SNF located in Shakopee, Minnesota. Admin. R. ("A.R.") [Docket No. 18] at 2, 673. It is a nonprofit corporation solely owned by Benedictine Health Systems ("Benedictine"). Id. at 403, 412-14. Construction on St. Gertrude was completed in 1996, the facility opened on November 4, 1996, and it became Medicare certified on November 8, 1996. Id. at 2. In 1996 and continuing to date, Minnesota applies a moratorium, which began in 1983, on the "licensure and medical assistance certification of new nursing home beds and construction projects that exceed $1,000,000." Minn. Stat. § 144A.071 (1996). The stated purpose of the moratorium is "to control nursing home expenditure growth and enable the state to meet the needs of its elderly by providing high quality services in the most appropriate manner along a continuum of care." Id., subd. 1. Pursuant to the moratorium, the Minnesota Department of Health ("MDH") is required to deny all requests for new licensed or certified nursing-home beds, subject to certain exceptions, including an exception for the replacement or relocation of beds to a new facility. Id., subds. 2(b), 4a. Accordingly, when St. Gertrude

---

[3] The new provider exemption is now codified at 42 C.F.R. § 413.30(d).

opened, licensure of its nursing-home beds was prohibited unless a corresponding number of beds were eliminated at an existing facility.

Valley View Health Care Center ("Valley View") was a 102-bed SNF built in 1980 in Jordan, Minnesota. A.R. at 3. It was first certified to participate in the Medicare and Medicaid programs in 1985.[4] Id. at 947. It was the only nursing facility in Jordan and approximately three-quarters of its residents came from the Jordan, Chaska, and Shakopee areas. Id. at 526. In October 1993, Valley View applied to MDH for a replacement exception from the moratorium on new nursing-home beds. Id. at 522-99. Valley View's application proposed relocating to a newly-constructed 102-bed facility in Jordan. Id. at 526. In January 1994, MDH approved Valley View's proposal determining there was a "demonstrated need for a new building to replace the current facility." Id. at 521. However, the new facility in Jordan was never built. Id. at 3. Instead, pursuant to special legislation passed by the Minnesota legislature, Valley View was allowed to relocate to St. Gertrude fifty-one of the 102 beds, which had originally been planned to be relocated to Jordan, and on November 4, 1996, MDH issued a license to St. Gertrude to operate a fifty-one bed nursing home. Id. at 3, 374; see Minn. Stat. § 144A.073, subd. 5(g) (1996). Approximately one month later, the number of Valley View's certified beds was decreased by fifty-one.[5] A.R. at 1081.

---

[4] Seventy-five of Valley View's beds were certified to participate in the Medicare program. A.R. at 15.

[5] Additional special legislation was passed in 1999 increasing to seventy-five the number of Valley View's beds that were allowed to be relocated, and, as a result, another twenty-four of Valley View's beds, as well as its Medicaid-eligible patient population, were transferred to St. Gertrude. A.R. at 16; see Minn. Stat. § 144A.073, subd. 5(g) (2000). Valley View ultimately closed in May 2000 and its remaining beds were decertified. A.R. at 710.

In January 1997, St. Gertrude submitted a request that it be granted a new-provider exemption from the RCLs for the cost-reporting periods ending on June 30, 1997, and June 30, 1998. Id. at 3, 349. CMS denied St. Gertrude's request, stating that (1) the "reallocation and relocation of 51 beds" from Valley View represented a change of ownership; (2) Valley View was "clearly an equivalent provider of skilled nursing and/or rehabilitative services" and operated as a SNF during the three years before the transfer; and (3) the population served as a result of the transfer "did not substantially change, nor was there a change in the primary service area." Id. at 617-19. St. Gertrude requested a hearing before the Provider Reimbursement Review Board ("PRRB"), which reversed CMS's decision. Id. at 623, 646. On July 18, 2007, the Secretary, acting through the CMS Administrator, reversed the PRRB's decision. Id. at 21. The Administrator explained that St. Gertrude did not qualify for the new-provider exemption because St. Gertrude acquired its beds as a result of a change in ownership and the type of services provided by the prior owner (Valley View) in the three years prior to the opening of St. Gertrude were the same services for which St. Gertrude is certified. Id. at 20. St. Gertrude commenced this action under 42 U.S.C. § 1395oo(f)(1) to challenge the Secretary's decision, claiming that it was arbitrary and capricious. Compl. ¶ 39.

### III. DISCUSSION

**A.      Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

St. Gertrude's challenge to the Secretary's decision is subject to judicial review under the Administrative Procedures Act, which requires that a reviewing court not overturn an agency's decision unless it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 5 U.S.C. § 706(2). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983). "[A]n agency's interpretation of its own regulations" is entitled to "substantial deference" and "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994). "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" Id. (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)). If the meaning of regulatory language is ambiguous, "the reviewing court should give effect to the agency's interpretation so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150-51 (1991) (quotation omitted).

**B.     The Secretary's Interpretation**

The case turns on the interpretation of the new-provider exemption from the RCLs under 42 C.F.R. § 413.30(e). To be eligible for the exemption, a SNF must qualify as a "new provider," which is defined as "a provider of inpatient services that has operated as the type of provider (or the equivalent) for which it is certified under Medicare, under present and previous ownership, for less than three full years." Id.  Although the regulation does not define the terms "provider" and "previous ownership," the Secretary has issued HCFA Pub. 15-1, commonly referred to as the Provider Reimbursement Manual ("PRM"), to give further guidance on the new-provider exemption. The PRM expresses the administrative interpretation of the Medicare statute and regulations and the considerations involved in determining whether a particular SNF qualifies for the new-provider exemption. See Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 101-02 (1995) (referring to the PRM as a set of interpretive rules).

In elaborating on the applicability of the new-provider exemption, the PRM clarifies that a change of ownership ("CHOW") "does not in itself make an institution . . . eligible for a new provider exemption." PRM § 2533.1.E.  The PRM defines a CHOW as including the "[d]isposition of all or some portion of a provider's facility or assets (used to render patient care) through sale, scrapping, involuntary conversion, demolition or abandonment if the disposition affects licensure or certification of the provider entity." Id. § 1500.7.  In addition, the PRM states, by way of example, that a CHOW occurs when "an institution . . . purchases the right to operate . . . long term care beds from an existing institution . . . that has or is rendering skilled nursing or rehabilitative services to establish . . . a longer term care facility or to enlarge an existing long term care facility." Id. § 2533.1(E)(1)(b).

The Secretary has thus interpreted section 413.30(e) to mean that if a SNF seeking new-provider status was established through a transfer of assets or rights that are necessary to those services—in this case, the transfer of nursing-home beds certified by MDH to participate in the Medicare program—and the previous owner of those assets or rights provided equivalent services, a CHOW has occurred, and, accordingly, the operation history of the previous owner is imputed to the SNF. See A.R. at 13-14, 18. If that operation history includes the previous owner having provided equivalent services during the prior three years, the SNF will be denied new-provider status. See 42 C.F.R. § 413.30(e).

### 1. Ambiguity

The Secretary contends that section 413.30(e) is ambiguous, and that in light of such ambiguity, his interpretation is entitled to deference. See Martin, 499 U.S. at 150-51. St. Gertrude claims that the Secretary's interpretation of section 413.30(e) "contradicts the plain meaning of the regulations and is therefore arbitrary and capricious." Pl.'s Mem. in Supp. of Mot. for Summ. J. [Docket No. 11] at 17. The issue of whether section 413.30(e) is ambiguous has yet to be addressed by the Eighth Circuit. The circuit courts that have considered the issue have split. Compare Providence Health System-Washington v. Thompson, 353 F.3d 661, 665 (9th Cir. 2003) (holding that section 413.30(e) is inherently ambiguous); South Shore Hospital, Inc. v. Thompson, 308 F.3d 91, 98 (1st Cir. 2002) (same); Paragon Health Network v. Thompson, 251 F.3d 1141, 1148 (7th Cir. 2001) (same), with Ashtabula County Med. Ctr. v. Thompson, 352 F.3d 1090, 1097 (6th Cir. 2003) (rejecting Paragon and holding that section 413.30(e) is unambiguous), and Maryland Gen. Hosp., Inc. v. Thompson, 308 F.3d 340, 347 (4th

Cir. 2002) (rejecting Paragon and holding that the Secretary's interpretation of section 413.30(e) was inconsistent with the regulations unambiguous language).

The source of apparent ambiguity in section 413.30(e) lies in the terms "provider" and "previous ownership." See South Shore, 308 F.3d at 98. It is the interplay of those terms that "renders the regulation inherently ambiguous." Providence, 353 F.3d at 665. As the Seventh Circuit observed in Paragon:

> [A] nursing "provider" is composed of many different attributes, but changing one or more of these characteristics does not mean that the SNF becomes a different "provider." For example, if a facility fires all its staff and hires a new one, but makes no other changes, an ordinary user of the English language probably would consider the SNF with the new staff to be the same "provider" as it was before. Similarly, a SNF that replaced all of its old equipment with new models, would still be the same "provider" as it was before the modernization. Even if a SNF both fired its staff and replaced all of its equipment, one might still call it the same "provider" if the administration and physical plant remained the same. Of course, if all the various things that made up a SNF were new in the sense that they had not been part of another facility, then one would have to call that SNF a "new provider." Conversely, if a nursing facility did not change any of its aspects, it would unquestionably continue to be the same provider rather than a new one. The difficulty in drawing a line between these two extremes is what makes the word "provider" ambiguous as used in the regulation.

251 F.3d at 1148.

The Secretary claims that St. Gertrude could not function as a SNF without Valley View's bed rights acquired by means of Minnesota's special legislation, and thus, the transfer of those bed rights constituted a CHOW that disqualifies St. Gertrude from the new-provider exemption. St. Gertrude responds that the Secretary's focus on the bed rights is unreasonable and that because Valley View and St. Gertrude "shared no employees, medical staff or administrators; operated under separate Medicare certifications and separate license; and there

was no significant overlap of patients served," no CHOW occurred and St. Gertrude is therefore a new provider. See Pl.'s Mem. in Supp. of Mot. for Summ. J. at 11-12.

Under similar circumstances and in response to similar arguments, the Ninth Circuit aptly explained that "[n]either interpretation is plainly foreclosed by the regulation." Providence, 353 F.3d at 666. "Because the regulation is not drawn in blacks and whites but leaves significant gray areas unresolved, it is ambiguous." South Shore, 308 F.3d at 98. The Court is persuaded by the reasoning of the First, Seventh, and Ninth Circuits and finds the language of section 413.30(e) to be ambiguous.

### 2. Reasonableness

Having concluded that section 413.30(e) is ambiguous, the Court must defer to the Secretary's interpretation if that interpretation is reasonable. See Thomas Jefferson, 512 U.S. at 512. "Medicare is a highly complex and technical program, and so deference to the Secretary's determinations in the course of administering the system is especially warranted." Paragon, 251 F.3d at 1149 (citing Thomas Jefferson, 512 U.S. at 512). In addition, "change of ownership is a term of art in the Medicare context," and, "[a]s such, interpretation of the term lies peculiarly within the compass of the Secretary's expertise." South Shore, 308 F.3d at 100. Furthermore, the burden is not on the Secretary to prove that his interpretation is reasonable, but rather, "[t]he burden is on the party challenging the Secretary's reasoning to show that it fails to pass muster under the reasonableness standard." Id. at 101. With these principles in mind, the pivotal question here is whether the Secretary's position that the operation history of Valley View should be imputed to St. Gertrude on the ground that the transfer of bed rights from Valley View

to St. Gertrude constituted a CHOW is a reasonable interpretation of the regulation.  For several reasons, the Court concludes that the Secretary's interpretation was reasonable.

The end result of the transfer of Valley View's bed rights to St. Gertrude was that "no new nursing home beds were added to the system, but rather, the existing licensed capacity was moved from one location to another."  A.R. at 18.  Conceding that Valley View and St. Gertrude had different employees, medical staff, and administrators; had separate Medicare certifications and separate licenses; and were owned by different entities, the Secretary's focus on bed rights in determining that a CHOW occurred may still be reasonable.  Because "bed rights are an essential characteristic of providership," it was not unreasonable for the Secretary to focus on bed rights.  Providence, 353 F.3d at 666; see also South Shore, 308 F.3d at 98-99 (stating that bed rights were a "sine qua non for the operation of a nursing home," and holding that it was reasonable for the Secretary to use the transfer of such rights as a basis for imputing a previous owner's operations to a provider); Paragon, 251 F.3d at 1149 (upholding as reasonable the Secretary's interpretation that because the transfer of bed rights did not result in any new services, there had not been a "new provider").  Moreover, this Court finds the logic of the dissent in Maryland Gen. Hosp. to be particularly persuasive in evaluating the reasonableness of the Secretary's focus on bed rights:

> Ultimately, it is the Secretary's task to give content to the term "new provider."  Unlike the majority, I find that focusing on [bed] rights is a reasonable exercise of interpretive discretion. . . .  Given the centrality of [bed] rights in defining the class of existing service providers under state law, it is quite reasonable for the Secretary to rely on these bed rights in giving meaning to related federal regulations. . . .  Because Medicare is such a complex, regulatory program, this Court should decline to displace the Secretary's policy choices in favor of its own.

308 F.3d at 350 (Gregory, J., dissenting) (citations omitted).

In addition, the Secretary's determination that a transfer of bed rights such as that between Valley View and St. Gertrude is a CHOW is consistent with the purpose of the new-provider exemption. See A.R. at 14; Def.'s Mem. in Opp. to Pl.'s Mot. & in Supp. of Def.'s Mot. for Summ. J.[Docket No. 16] at 19. The new-provider exemption "was implemented to recognize the difficulties in meeting the applicable cost limits due to underutilization during the initial years of providing skilled nursing and/or rehabilitative services." PRM § 2533.1(A). "Put another way, the exemption was meant to allow a [new] provider to recoup the higher costs normally resulting from low occupancy rates and start-up costs during the time it takes to build its patient population." St. Elizabeth's, 396 F.3d at 1230-31 (alteration in original) (quotation omitted). But in states such as Minnesota, where moratoriums on new nursing-home beds have been enacted, the moratoriums "effectively limit the number of permitted beds and thus reduce competition among [SNFs]." South Shore, 308 F.3d at 100; see also Paragon, 251 F.3d at 1150 (stating that institutions in moratorium states "are insulated from the effects of competition with new entrants"). A new SNF in a moratorium state will therefore be less likely to experience low occupancy rates—or "underutilization" to use the PRM's choice of words—in its early years. See South Shore, 308 F.3d at 100. Consequently, denying reimbursement above the amount established by the RCLs to such a SNF is consistent with the purpose of the new-provider exemption.

Nevertheless, St. Gertrude maintains that the transfer of bed rights from Valley View did not constitute a CHOW because it did not involve "an actual asset exchange," did not affect Valley View's licensure, and was "entirely out of the control of [St. Gertrude]." Pl.'s Mem. in

Supp. of Mot. for Summ. J. at 9-11.  But a CHOW is not limited to dispositions that involve the exchange of assets and instead can include "scrapping, involuntary conversion, demolition or abandonment."  PRM § 1500.7.  And despite St. Gertrude's argument to the contrary, the transfer of bed rights here most certainly affected Valley View's licensure.  Within one month after the transfer had been completed, MDH decreased by fifty-one the number of certified nursing-home beds at Valley View.  A.R. at 1081.  Thus, as a direct result of the transfer, Valley View's licensure regarding certified nursing-home beds was reduced to half the number of beds as before the transfer.  See Providence, 353 F.3d at 666 (concluding that a reduction in the number of licensed beds "*affected* [a provider's] licensure").  Addressing the argument that the transfer was accomplished by special legislation and thus was out of St. Gertrude's control, nothing in the language of the regulation or the PRM precludes the determination that a transfer under these circumstances constitutes a CHOW.  Moreover, St. Gertrude was not an unwilling recipient of the bed rights, and, in fact, the record includes evidence that the company that managed St. Gertrude and assisted in its development played a role in lobbying the Minnesota legislature to pass the special legislation that allowed the bed rights to be transferred to St. Gertrude in 1996.  See A.R. at 514-15.

Because St. Gertrude and Valley View were allegedly not owned by the same entity, St. Gertrude argues it is in a different posture than the facility in Paragon.  This argument was rejected in South Shore: "Insofar as we can discern, relationship through a common corporate parent will have little effect on whether the transfer of [bed] rights does (or does not) ameliorate a facility's underutilization."  308 F.3d at 100.  That being the case, "there is no principled reason" for treating a SNF that has common ownership with the predecessor facility differently

from one that does not when determining eligibility for the new-provider exemption. Id. This Court agrees with the First Circuit's reasoning.

St. Gertrude also makes the related argument that the Secretary's interpretation and application of section 413.30(e) arbitrarily penalizes states such as Minnesota that have a moratorium on new nursing-home beds. Specifically, St. Gertrude contends that because the Secretary deems a transfer of bed rights as constituting a CHOW, "no provider in a moratorium state could ever receive new provider status." Pl.'s Mem. in Supp. of Mot. for Summ. J. at 17. It follows, St. Gertrude maintains, that in a moratorium state, a new SNF would not be able to open without obtaining bed rights from an existing facility, thus causing the operation history of the existing facility to be imputed to the new SNF. But as the Seventh Circuit in Paragon explained persuasively in response to the same argument, "the Secretary can rely in part on the state's determination that no new nursing facilities are needed to support a decision that additional beds are unnecessary to the efficient delivery of health care services in that state." 251 F.3d at 1150.

In sum, the Court concludes that the language of section 413.30(e) is ambiguous and that the Secretary's decision to impute the operating history of a previous owner of bed rights (Valley View) to the acquiring SNF (St. Gertrude) is a reasonable interpretation of that ambiguity.

### 3. Equivalency

Although the transfer of bed rights from Valley View to St. Gertrude constituted a CHOW, St. Gertrude is disqualified from new-provider status only if a consideration of Valley View's operation history reveals that it "has operated as the [same] type of provider (or the equivalent)" during the prescribed three-year period. 42 C.F.R. § 413.30(e). Valley View was a SNF and was first certified as a Medicare provider in 1985. A.R. at 18, 947. As such, Valley

View, like St. Gertrude, provided skilled nursing care and related services and had been doing so for more than three years prior to St. Gertrude's opening.

In challenging the Secretary's determination that St. Gertrude and Valley View were equivalent providers, St. Gertrude argues that the patients that it serves are different from those served by Valley View. Specifically, St. Gertrude alleges that (1) the majority of its patients are Medicare patients, whereas the majority of Valley View's patients were Medicaid patients and (2) the patients at St. Gertrude received "post-acute care" and most stayed only a "few days to a few weeks," while the patients at Valley View were primarily long-term residents, some of whom stayed for years. Pl.'s Mem. in Supp. of Mot. for Summ. J. at 5; Pl.'s Mem. in Rep. to Def.'s Mem. [Docket No. 20] at 5. This argument was also rejected in South Shore, and the Court is again persuaded by the reasoning of the First Circuit. See 308 F.3d at 105-06.

It is within the discretion of the Secretary to focus not on the "particular level of care" provided by a facility but rather on a "broader definition of equivalency." Id. at 105. The Secretary's position is that SNFs that serve Medicare patients and SNFs that serve Medicaid patients both provide the same basic range of services. See id. at 106. Similarly, a SNF that serves patients whose stay is relatively shorter and a SNF that serves patients whose stay is relatively longer both provide the same kind of services, namely, skilled nursing care and related services. In this regard, the Secretary has advanced a policy as to what costs are reasonable (or unreasonable) and should (or should not) be reimbursed by the Medicare program. The Secretary's decision should not be reversed when doing so would require displacing that policy. Id. at 106. The Court is not persuaded that the claimed differences between the patients served at Valley View and those served at St. Gertrude renders unreasonable the Secretary's

determination that Valley View and St. Gertrude were equivalent providers. Because Valley View operated as an equivalent provider in the three years prior to St. Gertrude's opening, St. Gertrude does not qualify as a new provider under section 413.30(e).[6]

    **4.    Relocation**

The Secretary has interpreted section 413.30(e) to allow existing providers to be eligible in certain circumstance for the new-provider exemption when the provider relocates. See Paragon, 251 F.3d at 1150. The PRM explains the circumstances under which a relocation will warrant new-provider status:

> [A] provider which relocates may be granted new provider status where the normal inpatient population can no longer be expected to be served at the new location. The distance moved from the old location will be considered but will not be the determining factor in granting new provider status. . . . A provider seeking new provider status must . . . demonstrate that in the new location a substantially different inpatient population is being served.

PRM § 2604.1. When a SNF is established in a new location through the purchase or reallocation of bed rights, the Secretary considers such an event to be a relocation, thus raising the question of whether the SNF qualifies as a new provider under the criteria in section 2604.1. See id. § 2533.1.B.3.

---

[6] The Administrator determined, in the alternative, that St. Gertrude does not qualify as a new provider due to the Administrator's finding that both St. Gertrude and Valley View were owned by the same entity. A.R. at 17-18. St. Gertrude challenges this finding of common ownership, claiming that it is without any factual support in the record. Because St. Gertrude does not qualify for the new-provider exemption on the ground that the transfer of bed rights constituted a CHOW and the previous owner operated as an equivalent provider in the three years prior to St. Gertrude's opening, the challenge regarding the finding of common ownership will not be addressed here.

Here, the Administrator determined that St. Gertrude did not qualify as a new provider under the relocation provision in section 2604.1 because "the patient population served at [Valley View] can continue to expect to be served at [St. Gertrude's] location," and, therefore, St. Gertrude "cannot demonstrate that, in the new location, a substantially different inpatient population is being served." A.R. at 19. In support of this determination, the Administrator found that seventy-three percent of the patients at St. Gertrude came from the same cities and towns as did the patients at Valley View. See id. at 19. The record supports this finding, and, accordingly, the Court upholds the Administrator's determination that St. Gertrude does not meet the requirements for qualification as a new-provider based on a relocation. See id. at 914; Paragon, 251 F.3d at 1150-52 (upholding a determination that a provider did not qualify as a new provider by virtue of a relocation on the ground that the majority of the patients at the new location came from the same cities and towns as the patients at the original location did).

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that St. Gertrude's Motion for Summary Judgment [Docket No. 9] is **DENIED** and the Secretary's Motion for Summary Judgment [Docket No. 14] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


     s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: October 8, 2008.